# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| ANNIE HOWELL, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | Case No.: **4:07-CV-00186-RDP** |
| | } | |
| COMPASS GROUP, | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant Morrison Management Specialists, Inc.'s ("Morrison") Motion to Quash Untimely Discovery (Doc. #27),[1] filed November 14, 2008, Plaintiff's Motion to Compel (Doc. #28),[2] filed November 21, 2008, Defendant's Motion for Summary Judgment (Doc. #30),[3] filed December 16, 2008, Plaintiff's Motion to Strike Declarations of Gina Paige and Rob Cooperman (Doc. #36),[4] filed January 14, 2009, and Defendant's Motion to Strike

---

[1] Plaintiff filed her response brief and motion to compel the discovery at issue (Doc. #28) on November 21, 2008. Defendant filed its reply (Doc. #29) on November 25, 2008, bringing this motion under submission. The court had previously set this and other motions for a hearing but Plaintiff's counsel indicated she did not receive the electronic notice. Neither party has requested that oral argument be rescheduled and the court has elected to take these motions under submission without oral argument.

[2] Plaintiff's Motion to Compel is directed toward Gadsden Regional Medical Center, which did not file any objections to Plaintiff's subpoenas under Federal Rule of Civil Procedure 45(c)(3).

[3] Plaintiff filed her response (Doc. #34) on January 9, 2009. Defendant filed its reply (Doc. #38) on January 20, 2009, bringing this motion under submission.

[4] Defendant filed its response (Doc. #37) on January 20, 2009. Plaintiff did not file a reply. Therefore, this motion was taken under submission on January 24, 2009. However, the court's summary judgment decision is unaffected by these pieces of evidence. Therefore, the court will not consider this evidence at summary judgment and Plaintiff's motion is moot.

Portions of Plaintiff's Affidavit (Doc. #39),[5] filed January 20, 2009.  As explained more fully below, Defendant's motion to quash is due to be denied, Plaintiff's Motion to compel is due to be granted, and Defendant's motion for summary judgment is due to be granted in part and denied in part.

## I.   Defendant's Motion to Quash Untimely Discovery and Plaintiff's Motion to Compel Discovery

### A.   Background

On September 25, 2008, Plaintiff filed her fifth motion for an extension of time (Doc. #23). The court granted the motion and ordered that "[a]ll discovery is to be commenced to be completed in time by November 17, 2008."  (Doc. #26).  On September 18, 2008, Plaintiff served Defendant with a second request for production of documents (Doc. #28-1) specifically seeking the metadata from disciplinary notices in Plaintiff's personnel file.  On October 29, 2008, Defendant responded to this request (Doc. #28-2) indicating that the computer containing the requested data is not owned by Defendant, but rather by Gadsden Regional Medical Center ("GRMC"), where Defendant's office is located.  However, Defendant also stated that it "is working to secure access to such data in order to produce to Plaintiff."  On November 4, 2008, Plaintiff took the depositions of Andy Carmichael and Jeff Jones.  They testified that the computer belonged to GRMC, not Compass Group, and had been accidentally destroyed.  On November 10, 2008, Plaintiff issued a Rule 45 subpoena to GRMC specifically requesting the metadata mentioned above, due on November 27, 2008, ten days after the passage of the final discovery deadline and without leave of court to exceed the discovery deadline. Defendant moved to quash this subpoena on November 14, 2008.

---

[5] Plaintiff was ordered to file her response to this motion on or before February 3, 2009. Plaintiff did not file any response.  Therefore, this motion is unopposed and is due to be granted.

On September 17, 2008, Plaintiff issued a subpoena to GRMC requesting emails sent to the Director of Food and Nutrition on Patient Surveys, all Patient Satisfaction Surveys, Gallup Surveys or Quarterly Surveys for the last five years that directly involve the Food and Nutrition Department of the Gadsden Hospital, Patient Satisfaction State Shot Reports for each quarter of the last five years for the Food and Nutrition Department with the comment section that deals directly with Food and Nutrition.  The subpoena requested that this information be produced on September 28, 2008. GRMC sent a letter to Plaintiff's counsel on November 17, 2008 (Doc. #28-7) responding to this request.  In the letter, GRMC contended that it was in possession of some of the requested materials, but would not provide those documents.  GRMC did not, however, file with the court any objection to this subpoena.

### B.    Plaintiff's Subpoena for Metadata

Plaintiff timely sought these materials from Defendant in her September 2008 request for production.  It appears to the court that the timeliness issue only arose because Defendant waited until October 29, 2008 to inform Plaintiff that it was not in possession of the computer in which the documents may be found.  Accordingly, the court finds that Defendant's motion to quash or in the alternative, for a protective order is due to be denied.[6]  Defendant is ordered to produce the documents at issue if it has access to those documents.  Plaintiff's Rule 45 subpoena (Doc. #27, Ex.

---

[6] The court notes, however, that in this case Plaintiff has had a continuing problem of failing to seek leave of court when operating outside of the guidelines set by court rules and orders.  This will serve as Plaintiff's final warning.  Future failures to comply with the rules of this court and court orders will not be tolerated.

A) is due to be modified to allow Gadsden Regional Medical Center until May 4, 2009 to respond to Plaintiff's request.[7]

### C.      Plaintiff's Subpoena for Surveys

Plaintiff's response (Doc. #28) includes a motion to compel this information.  Defendant only objects to Plaintiff's proposed discovery on timeliness grounds and there is no response to Plaintiff's Motion to compel on behalf of GRMC (Doc. #29 at ¶10).  This subpoena requested production by September 28, 2008, well before the discovery deadline of November 17, 2008.  GRMC did not file a timely motion to quash or modify the subpoena.  *See* Fed. R. Civ. P. 45(c)(3).  Accordingly, Plaintiff's motion to compel GRMC to produce documents referred to in her September 17, 2008 subpoena is due to be granted.  Gadsden Regional Medical Center is ordered to produce documents responsive to Plaintiff's subpoena on or before May 4, 2009.  This discovery will be governed by the consent protective order (Doc. #17), entered on March 17, 2008.

## II.      Defendant's Motion for Summary Judgment

Plaintiff Annie Howell commenced this action by filing a complaint on January 26, 2007, alleging that Compass Group (later corrected to the proper Defendant, Morrison Management Specialists, Inc.) discriminated against her because of her race (African-American), age (DOB: June 1, 1953), and in retaliation for filing an EEOC charge in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII"); 42 U.S.C. §1981; the Code of Alabama, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*; and the laws of the State of Alabama.  For the reasons outlined below, Defendant's motion for

---

[7] It is unclear whether the documents in question exist at all.  Plaintiff has remarked in her brief that the computer which allegedly contained the metadata sought was accidentally destroyed by a cleaning crew.

4

summary judgment is due to be denied with respect to her retaliation claims, but granted with respect to all other claims.

### A.    Legal Standard for Evaluating Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate,

nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden, the plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

### B.    Relevant Undisputed Facts[8]

#### i.    Background

Defendant provides healthcare food and nutritional services to hospitals and other institutions throughout the United States on an independent contractor basis.  At all times relevant to this case, Defendant provided such services at GRMC in Gadsden, Alabama.  (A.F. #1).[9]  Aside from providing food to patients at the hospital, Morrison also manages a cafeteria in the hospital for retail customers, otherwise known as Morrison's retail operation at Gadsden.  (A.F. #2).

Plaintiff began working at Baptist Hospital, now GRMC, in or around 1972.  (A.F. #5).  She worked for Baptist until Morrison took over her group.  (Doc. #30-5 at 23).  Her jobs included nursing aide, diet clerk, supervisor of the dietary department, and patient services manager.  (*Id.* at 29, 39).  Her responsibilities included making sure employee got to work on time, getting lines set up for serving patient breakfasts and lunches, checking to make sure that patient food trays were

---

[8] If facts are in dispute, they are stated in the manner most favorable to the plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

[9] These facts, contained in Defendant's brief in support of its motion for summary judgment, were admitted by Plaintiff in her response and will heretofore be referenced as "Admitted Fact" ("A.F.").  (Doc. #30-1, #34).

prepared and delivered, making certain the schedule was made for all hospitality employees, inputting floor stock and nourishment into the appropriate databases, and visiting and surveying patients to determine their "likes" and "dislikes." (*Id*. at 24, 31-33, 37-39). Plaintiff's jobs were considered "on the patient services side" rather than "on the retail side." (*Id*. at 113).

Andy Carmichael currently works for Morrison as Director of Food & Nutrition Services in Odessa, Texas. From 2005 through January 2007, Mr. Carmichael served as Director at the Gadsden location, where he oversaw Morrison's day to day operations. (A.F. #7). In 2005, both Plaintiff and Tanya Williamson (43 years old at time of promotion) reported directly to Mr. Carmichael. At that time, Ms. Williamson was the Retail Manager and Plaintiff was Patient Services Manager. (A.F. #8; Doc. #30-7 at 143).

Ms. Williams began working for Morrison in 1998 in the deli department. (Doc. #30-7 at 24). Ms. Williams was eventually promoted to the Retail Supervisor position. (A.F. #10). In that position, Ms. Williams supervised the cafeteria, which included making employee schedules, dealing with customer related complaints, and overseeing daily operation of the cafeteria. (Doc. #30-7 at 28-29, 31). In 2003, Ms. Williams became the Retail Manager, a position that includes helping in ordering food products, helping with patient satisfaction, visiting patients, setting cafeteria menus, and catering. (*Id*. at 31-33; #30-9 at 59).

### ii.     Failure to Promote to the Position of Assistant Director

In 2006 Mr. Carmichael and the Regional Director of Operations, Rod Anders, decided to create an Assistant Director position, with a stronger focus within the department (and within retail specifically) who would develop relationships within the cafeteria with customers and employees and to be a decision maker when Mr. Carmichael was not at the facility. (Doc. #30-9 at 32).

7

Plaintiff claims that she was not promoted to this position, but has given conflicting testimony as to whether the job was posted on Morrison's website (Doc. #30-5 at 90-91, 131).  The record reflects that Plaintiff knew how to locate job openings on the website and that the position was indeed posted.  (*Id*. at 63-64, 123-24, 131, #30-2 at Ex. 1).  Ms. Williamson was awarded the position after applying online.  (Doc. #30-7 at 45).  Though Plaintiff spoke with Kim Heath, Andy Carmichael, and Rod Anders about the position, she did not apply for it.  (Doc. #32-1 at ¶6).

In January 2007, Ms. Williams became Director of Food & Nutrition at the Gadsden Unit. (A.F. #20).  Ms. Williams hired Jeffrey Jones for the Assistant Director position.  (Doc. #30-7 at 76). Mr. Jones applied for the position through the website, received an interview, and was subsequently hired on January 11, 2007.  (Doc. #30-10 at 32).  Plaintiff applied for the position on line, but was knocked out of contention after mistakenly reporting that she had been disciplined within the previous six months.  (Doc. #30-5 at 95).[10]

While Mr. Carmichael was in Gadsden, he completed two evaluations for Plaintiff.[11]  In her December 5, 2005 evaluation, Plaintiff indicated that her job as Patient Services Manager satisfied her aspirations.  (A.F. #29).  Part of Morrison's evaluation includes a section where the associate supervisor, in this case Mr. Carmichael, has an opportunity to complete an appraisal summary addressing, among other things, promotion readiness and leadership potential.  (A.F. #30; Doc. #30-2

---

[10] Defendant asserts and Plaintiff agrees that Plaintiff's failure to receive this promotion is not the subject of the present lawsuit, though Plaintiff alleges it was discriminatory.  Plaintiff represented in her brief that a separate EEOC charge was filed relating to this claim and it is the subject of a separate lawsuit.  (Doc. #34 at 21).

[11] Plaintiff contends that she was not provided all pages of the evaluations when they were created and did not know what scores she received in these evaluations until these documents were produced in discovery.  (Doc. #32-1 at ¶7)

at Ex. 2).  On Plaintiff's 2005 evaluation, she received a promotional readiness rating of three (3), which means she was not ready for a promotion.  (Doc. #30-2 at Ex. 2).  She also received a zero (0) on leadership potential meaning she was not demonstrating any leadership skills or did not have the desire to advance to multi-site/middle management or senior management.  (*Id*.).  On her November 7, 2006 evaluation, Plaintiff noted that her job as Patient Services Manager satisfied her aspirations because she "enjoy[s] visiting patients, meeting their family members, and making sure they are satisfied."  She also noted that "taking care of patients is what [she] do[es] best and what [she] enjoy[s]."  (A.F. #32; Doc. #30-2 at Ex. 2).  In the Appraisal Summary for the 2006 evaluation, Plaintiff received a promotional readiness rating of two (2), meaning she was well-placed in the position she already held.  She again scored a zero (0) in leadership potential.  (Doc. #30-2 at Ex. 2).

Prior to filing her complaint, Plaintiff filed a charge of discrimination with the EEOC on April 7, 2006.  (A.F. #38).  The only allegations made in the charge and/or complaint revolve around the promotion Ms. Williamson received to the position of Assistant Director in March 2006.  (A.F. #39).

### iii.    Disciplinary Write-ups and Notes to File Regarding Plaintiff's Performance

On June 27, 2005, Mr. Carmichael wrote a memo indicating Plaintiff had been issued a verbal warning for several things, including ordering stock when not needed, failing to make patient rounds, showing favoritism to staff, and arriving at and leaving work at sporadic times.  (Doc. #30-2 at Ex. 5).  On June 30, 2005, Mr. Carmichael issued Plaintiff a progressive counseling, which Plaintiff signed, citing her infractions on June 27, 2005, and indicating that on June 30, Plaintiff did

not call in or return a call from Mr. Carmichael and she came to work at 12:20 p.m., her normal

working hours being 6:30 a.m. to 4:00 p.m.[12]  (Doc. #30-2 at Ex. 6).

On August 24, 2005, Mr. Carmichael made a note indicating he had reprimanded Plaintiff

a second time for inventory and excessive ordering.  (*Id*. at Ex. 7).  On March 31, 2006, Mr.

Carmichael made a note that Ms. Howell left work early without informing the Assistant Director

that she would be leaving.  (*Id*. at Ex. 8).  On April 7, 2006 (the same day Plaintiff filed her charge

with the EEOC), Ms. Williamson wrote a letter to the file regarding Plaintiff's job performance in

the few weeks prior to the letter.  Among other things, Ms. Williams noted that Plaintiff had been

distancing herself from other managers and issues concerning the department; she had not been

doing proper rounds to patient rooms; she was neglecting employee overtime hours; and she was

failing to follow up on write-ups of porters working under her.  (*Id*. at Ex. 9).  On April 12, 2006,

Mr. Carmichael wrote another note to the file indicating that he had a conversation with Plaintiff

about disregarding her scheduled working time, and also discussed being a team player and working

with people in the department.[13]

Plaintiff testified that she believes she began receiving disciplinary write-ups in retaliation

by Mr. Carmichael because she never had any write-ups in her file until Mr. Carmichael became her

---

[12] Plaintiff, in her affidavit, contends that Mr. Carmichael told her to come in late that day because she had worked thirteen hours the previous day and he did not want her to accumulate overtime.  She arrived at 12:20 p.m. after receiving instructions to arrive at 12:30 p.m.  She disputed the write up and told Mr. Carmichael that he told her to come in late, but he refused to change it. (Doc. #32-1).

[13] Plaintiff admits that each of these notes appears in the file, but contends that they were not presented to her at the time they were written and she was not aware of them until after this litigation began.

supervisor.  She admits, however, that she had received write-ups before her EEOC charge and also after Mr. Carmichael left the Gadsden location.  (A.F. #49; Doc. #30-6 at 136-37, 190-92).

Between April 13, 2006 and January 26, 2007, when Plaintiff filed her complaint alleging retaliation, Plaintiff was written up three times – once on April 13, 2006 for failing to have anyone scheduled to lead the tray line for breakfast, once on June 15, 2006 for failing to place the dessert cart on the OB floor and for not having her hospital issued phone with her, and once on October 25, 2006 for being two hours late to work.  (Doc. #30-2 at Ex. 12, 13, 14).  Plaintiff contends that these notes were not presented to her and further that the information contained in the notes is false.  (Doc. #32-1 at ¶9).

On February 19, 2007, Plaintiff was written up because she allowed "the Unit" to run out of Jevity product.  (Doc. #30-2 at Ex. 15).  On February 26, 2007, Ms. Howell was written up for having a supervisor (Laveagie Bullock) work off the clock and paying her from her own pocket.  (*Id.* at Ex. 16).

Plaintiff was placed on a performance improvement plan by Mr. Carmichael.  Plaintiff and Mr. Carmichael met two times.  Although Plaintiff was instructed to keep a log or journal of everything she did in the department, Mr. Carmichael never asked to see the log.  (Doc. #32-1 at ¶11).  After Mr. Carmichael left Gadsden, the performance plan was never renewed.

### iv.    Other Alleged Incidents of Retaliation

Plaintiff believes that Jeffery Jones discriminated against her in retaliation for filing her charge of discrimination and subsequent lawsuit.  Plaintiff explained that Mr. Jones knew about the lawsuit she had filed.  Plaintiff asked her attorney to forward a letter to Mr. Jones about retaliation, and Plaintiff believes that letter upset Mr. Jones.  She reported that the day he received the letter, Mr.

Jones said as he was leaving, "[s]ee you girl.  You have a good evening, girl, you hear."[14]  (Doc. #30-5 at 102-04).

Plaintiff contends that she was the only manager who had set hours, 6:30 a.m. through 4:00 p.m.  She also claims she was the only manager who did not have a computer, even though she repeatedly asked for one.  (Doc. #32-1 at ¶9).[15]

After the incident where Plaintiff mistakenly knocked herself out of the running for a promotion by answering "yes" to a question about previous discipline, she called the recruiter, Rob Cooperman back to tell him about the mistake.  He reportedly replied that "it doesn't matter as [she had] already messed [her] own self up anyway and would not get the job."  (Doc. #32 at ¶13).

**C.     Discussion**

Plaintiff asserts claims for failure to promote, retaliation, negligent hiring and supervision, and intentional infliction of emotional distress under Title VII; § 1981; the ADEA; the Alabama Age Discrimination in Employment Act ("AADEA"), Ala. Code 1977 § 25-1-20 *et seq*.; and Alabama law claims of intentional infliction of emotional distress and negligent supervision, training, hiring, and retention.  In their briefs, the parties agree that the only claims/allegations to be considered are those related to the promotion received by Ms. Williamson and the retaliation that Plaintiff claims she suffered as a result of filing her EEOC charge based on that promotion.

---

[14] Mr. Jones denied that he has ever referred to anyone as "girl" including Plaintiff (Doc. #10 at 97-99), but the court must view the evidence in the light most favorable to Plaintiff.

[15] Although portions of this paragraph have been struck in accordance with Defendant's motion (Doc. #39), these assertions in paragraph nine were not the subject of Defendant's challenge and are, thus, included in the summary judgment record.

i.      **Failure to Promote**

Defendant argues that Plaintiff cannot establish a *prima facie* case of discriminatory failure to promote.  Specifically, Defendant argues that Plaintiff cannot show that she applied for the position.  "In order to establish a *prima facie* case on the basis of a failure to promote, Plaintiff must demonstrate that: (i) she belonged to a protected class; (ii) she was qualified for *and applied for* a position; (iii) despite qualifications, she was rejected; and (iv) the position was filled with an individual outside the protected class." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 n.2 (11th Cir. 2007) (emphasis added); *see also Austin v. Progressive RSC, Inc.*, 265 Fed. Appx. 836, 844 (requiring a plaintiff to show "(1) she is a member of a protected class; (2) she was qualified *and applied for* the promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted") *quoting Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir.2004)) (emphasis added); *Denny v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001); *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000).

Here, the following facts are not in dispute: (1) Plaintiff knew the Assistant Director position was posted on the internet;[16] (2) in order to apply for that position, an applicant was required to

_____

[16] Indeed, Plaintiff testified in her deposition as follows:

    Q.      Tanya Williamson was first the retail manager?
    A.      Retail manager.
    Q.      Then she became Assistant Director?
    A.      Yes.
    Q.      Do you know if the Assistant Manager job was posted on the internet?
    A.      Yes -- the Assistant Director's job?
    Q.      Yes ma'am.
    A.      Yes.
    Q.      It was posted?

submit an application; and (3) Plaintiff failed to submit an application.  Ms. Williamson actually applied for the position.  Furthermore, though Plaintiff expressed interest in the Assistant Director position before the position became open, she never expressed any interest in the position once it was announced and applications were being received.  There is also evidence from her performance reviews that she expressed to her supervisors that she was happy in her position.  The court finds based upon these undisputed facts that Plaintiff has not shown that she applied for the position.

Plaintiff does not really quibble with these Rule 56 findings.  Rather, she contends that under *Cox v. American Cast Iron Pipe Co.* ("*ACIPCO*") she does not have to show that she applied in order to establish a *prima facie* case.  784 F.2d 1546 (11th Cir. 1986).  To be sure, the Eleventh Circuit held in *ACIPCO* that a nonapplicant can still establish a *prima facie* case if a "clear policy of exclusion would make an application a useless exercise," or "[w]here no policy of exclusion is actually in place, but the employer continues to hire by word of mount or other informal methods." *Id*. at 1560 (*citing International  Broth. of Teamsters v. U.S.*, 431 U.S. 324, 367-68 (1977)).

In cases where there is a clear policy of exclusion, a plaintiff must make two showings: (1) that she would have applied but for discrimination; and (2) that she would have been discriminatorily rejected had she applied.  *Id.* (*citing Teamsters*, 431 U.S. at 368 n. 52).  There is no evidence in the Rule 56 record, however, that Defendant had a "clear policy of exclusion."  *ACIPCO* involved an employer who "[b]efore December 1973 . . . deliberately reserved clerical jobs in its all-male production plant for men. . . . Only after this suit was filed did defendant allow a few women to make their way into the plant."  *Id*. at 1551-52.  Nowhere in this record is there any evidence that

---

A.      Yes.
(Doc. #30-5 at 93).

Defendant had a policy in place that discriminated against applicants based on their age, race, or gender.  In addition, Plaintiff cannot prove that she would have applied but for a clear policy of exclusion.  She made known to three different supervisors that she planned on applying for the position when it became open, but failed to apply once the job was posted on Morrison's website (even though she was aware it was posted).  Plaintiff cannot establish a *prima facie* case under *ACIPCO's* first exception.

Likewise, Plaintiff cannot prevail under *ACIPCO's* second exception.  The second exception only applies when there is no formal application process in place, but "the employer continues to hire by word of mouth or other informal methods."  *Id.* at 1560.  Morrison had a formal application method in place.  Available job opportunities were posted on the website.  In order to apply for the position of Assistant Director, an applicant was required to submit her application on the website.  As noted above, Plaintiff admitted that the position was posted on the website.  Because Plaintiff did not comply with the formal application procedure, she cannot establish a *prima facie* case.

Plaintiff argues that a different *prima facie* standard without an application requirement should govern.  The court recognizes that the *prima facie* case requirement should not be applied mechanically.[17]  Nevertheless, the cases Plaintiff cites – *Verbracken v. Westinghouse Elec. Corp.*, 881 F.2d 1041 (11th Cir. 1989), a reduction in force case, and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), a wrongful termination case – are of no help for her here.  As indicated above, the Eleventh Circuit has given specific guidance in cases of discriminatory failure to promote.  Plaintiff must demonstrate that she applied for the position or, alternatively, either that

---

[17] Indeed, the cases decided by our Circuit and the Supreme Court can be read to indicate that the real question at the *prima facie* case stage is whether Plaintiff can put forward enough to raise an inference of discrimination.  Here, with respect to her promotion claim, Plaintiff cannot.

a clear policy of exclusion would make an application a useless exercise or that Defendant hires by word of mouth or through other informal methods.  Plaintiff cannot make any of these showings and, has not pointed to anything else in the Rule 56 record which raises any inference of discrimination; therefore, she has not raised any issue of material fact with respect to her failure to promote claims and Defendant is entitled to judgment as a matter of law with respect to those claims.

### ii.        Retaliation

Plaintiff claims that the increase in write-ups she received and being put on a performance improvement plan were done in retaliation for filing her charge with the EEOC.  To establish a *prima facie* case for retaliation under Title VII or § 1981, Plaintiff must prove (1) she participated in a statutorily protected activity; (2) she suffered an adverse personnel action; and (3) there is a causal link between the protected activity and the adverse employment action. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n. 52 (11th Cir. 2008); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998).  The Supreme Court has held that in order to demonstrate an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted).  The Court spoke of material adversity in order to distinguish significant harms from trivial slights.  *Id*.  Further, the court highlighted the importance of employing an objective standard by including the phrase "reasonable employee."  *Id*.  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse act were at least

somewhat related." *Richardson v. Alabama Pine Pulp Co., Inc.*, 277 Fed.Appx. 907, 910 (11th Cir. 2008) (*citing Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)).

Mr. Carmichael placed Plaintiff on the performance improvement plan within a month of receiving notice that she had filed her charge of discrimination.  He had not written Plaintiff up for over a year when he placed her on the performance improvement plan.  Though Defendant repeatedly argues that the performance improvement plan was not a disciplinary measure, the question is whether a reasonable employee would have found the action materially adverse.  There exists a genuine question of fact on this point.  Furthermore, when Plaintiff called Mr. Cooperman to correct her mistake in applying for the Assistant Director position when it became available he replied that "it doesn't matter as [she had] already messed [her] own self up anyway and would not get the job."  If a reasonable trier of fact credits Plaintiff's testimony that this reply was made, it could also find the statement was made in reference to her EEOC charge.  Viewing these facts in a light most favorable to Plaintiff, the court finds that genuine issues of material fact exist and Defendant is not entitled to judgment as a matter of law on Plaintiff's retaliation claims.[18]

---

[18] Defendant argues that, because she received write ups before filing a charge of discrimination, Plaintiff cannot present substantial evidence indicating a causal connection. However, the record indicates that there was an increase in the incidents of write ups after her charge of discrimination was filed, as well as write ups from supervisors who had not written Plaintiff up before her charge.  The court is aware that some of Plaintiff's write ups both occurred after she filed her complaint alleging retaliation on January 26, 2007 (*e.g.*, her written discipline for allowing the Unit to run out of Jevity product on February 19, 2007, and for paying a supervisor out of her own pocket on February 26, 2007).  Thus, those particular incidents of discipline could not have formed the basis of Plaintiff's allegations of retaliation in her complaint, but that does not tell the whole story.  There are four write ups in the Rule 56 record that occurred during the period between the filing of her EEOC charge and her complaint and another one that took place on April 7, 2009, the day she filed the charge.  (Doc. #30-2).  Drawing all reasonable inferences in favor of Plaintiff, as the court must, it finds that Defendant has not demonstrated that it is due judgment as a matter of law on Plaintiff's retaliation claims.  Furthermore, Defendant argues that by filing her complaint, Plaintiff was not dissuaded from supporting a charge of discrimination, this argument ignores the

### iii.    Intentional Infliction of Emotional Distress (Outrage)

To assert a claim for outrage under Alabama law, a plaintiff must prove that a defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Soti v. Lowe's Home Centers, Inc.*, 906 So.2d 916, 919 (Ala. 2005) (internal quotations omitted). In *American Road Service Co. v. Inmon*, the Alabama Supreme Court specifically identified what type of conduct was required for a plaintiff to maintain a claim:

> The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

394 So.2d 361, 365 (Ala. 1980).

Years after the Alabama Supreme Court set out what was required to state a claim for outrage in *Inmon*, it identified three types of cases where an outrage claims had presented jury questions: "1) cases having to do with wrongful conduct in the context of family burials, . . . 2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim, . . . and 3) a case involving egregious sexual harassment." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala.1993). Plaintiff's claim does not fit within one of these three categories.

The *Thomas* court's decision did not mention the case *Rice v. United Ins. Co. of America*, where the Court held that a plaintiff's outrage claim presented a jury question:

---

objective standard that Defendant highlights in its brief, and instead incorrectly relies on Plaintiff's subjective state of mind.

Here, Rice contends that, after she informed her employer that she had become pregnant, her supervisor, Louis Giannini, organized an attempt to force her to take disability leave rather than to work throughout her pregnancy. She contends he put pressure on her husband to use his influence with her to encourage her to take disability leave, that he repeatedly falsely accused her, in the presence of co-employees and clients, of incompetence; that on numerous occasions she was ridiculed, both alone, and in the presence of co-employees, that vital business information was withheld from her, and that, eventually, *she was wrongfully terminated*. She contends all the above mentioned behavior was calculated to force or coerce her into voluntarily taking disability leave from work during her pregnancy. *She alleges that a miscarriage she suffered one week after her job loss was a direct result of emotional distress inflicted upon her by Giannini*. . . .

The facts alleged in this case clearly distinguish it from those in *Inmon* and in *Beidler*. First, Rice alleges a pattern of activity, encompassing a period of several months. Second, defendants' alleged behavior involved a great many persons (Rice's co-workers, clients, and husband) in addition to Rice and the defendants. Third, defendants' alleged pattern of outrageous acts were directed toward plaintiff when Giannini was likely to know that *severe emotional distress could have serious physical* repercussions. Fourth, the outrageous actions alleged by Rice were directed toward an illegal purpose, discrimination against an employee because of sex. Such discrimination is prohibited by Title VII of the Civil Rights Act.

465 So.2d 1100, 1101-02 (Ala.1984) (emphasis added).[19]  There is no evidence in the record that rises anywhere near the level of the conduct alleged in *Rice*.  Most notably, there is no evidence that any emotional distress had any physical repercussions, much less, any severe physical repercussions.

Plaintiff argues that all that is required to get to a jury on the outrage claim is to show that the adverse employment action was a violation of public policy.  *Cf. Lees v. Sea Breeze Health Care Center, Inc.*, 391 F.Supp.2d 1103, 1107 (S.D. Ala. 2005) ("Where a plaintiff complains that her

---

[19] Defendant argues that *Rice* only addressed whether Plaintiff's outrage claim was subsumed by her Title VII claim.  Indeed, Section II of the opinion does discuss that.  Section I, on the other hand, addresses whether there was a jury question on the outrage claim.  "It is conceivable, under the facts alleged, that Rice can prove a set of facts in support of her claim of intentional infliction of emotional distress. Therefore, the trial court erred in dismissing that claim."  *Rice*, 465 So.2d at 1102.

discharge contravenes public policy, particularly if the discharge was the culmination of a protracted pattern of discrimination in violation of public policy, she may properly pursue a claim of outrage because the violation of public policy furnishes the requisite 'sound of fury' to accompany the termination.").[20]   However, that case also points out:

> This line of authority may be contrasted with, and limited by, another strand of caselaw suggesting that being subjected to unlawful discrimination over an abbreviated time period, or *facing unlawful conduct falling short of discharge*, may be inadequate to sustain a claim for outrage under Alabama law, even if the employer's acts otherwise are irreconcilable with sound public policy.

*Lees*, 391 F.Supp.2d at 1107 n.3 (*citing Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F.Supp.2d 1314, 1319 (N.D. Ala. 2002)) (emphasis added).  Thus, even *Lees*, a case not binding on this court, does not suggest that Plaintiff's allegations are enough to raise a jury question because here she has not been subject to discharge.

The evidence of record does not come close to that required by the Alabama Supreme Court in *Inmon* and its progeny.  Thus, there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law on Plaintiff's claims for intentional infliction of emotional distress.

### iv.    Negligent Hiring, Training, Supervision, and Retention

Under Alabama law no independent action for negligent supervision, hiring, training, supervision, and retention (hereinafter referred to collectively as "negligent supervision") exists. *Flying J. Fish Farm v. Peoples Bank of Greensboro*, 2008 WL 4687091 at *9 (Ala. 2008) (finding dismissal of negligent and/or wanton supervision is appropriate where the underlying claims of wrongful conduct are dismissed at summary judgment).  Rather, such assertions are merely a means

---

[20]   This case cites as its authority an Alabama Supreme Court case that *reversed* a trial court decision that allowed the outrage question to reach the jury.

of creating *respondeat superior* liability against an employer for some underlying tort engaged in by an employee.  *See Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 825 (Ala. 1999).

Claims for negligent supervision are derivative of underlying claims.  *Ekokotu v. Boyle*, 294 Fed.Appx. 523, 527 (11th Cir.  2008), *University Federal Credit Union v. Grayson*, 878 So.2d 280, 291 (Ala. 2003).  Thus, if the underlying claims fail, Plaintiff cannot sustain a claim for negligent supervision. *Ekokotu*, 523 Fed.Appx. at 291.  All of Plaintiff's claims have failed except for her retaliation claims.  Therefore, Plaintiff's negligent supervision claim can only be grounded in the factual basis for her retaliation claims.

Initially, the court notes that Plaintiff has abandoned this claim in her response brief. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Edmondson v. Board of Trustees of University of Alabama*, 258 Fed.Appx. 250, 253 (11th Cir. 2007) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)) ("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her.  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments. . . . Here, [plaintiff] did not respond to [defendant's] motion for summary judgment on the Equal Protection Act claim. Therefore, she has abandoned it."); *see also Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D. Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995) ("Summary Judgment is appropriate since plaintiff failed to respond to [defendant's] argument on this issue.") (citations omitted). The only time Plaintiff mentions her negligence claims in her brief other than in the subject heading is in the following sentence: "Based on the above supporting case law, Plaintiff has proven her *prima facie* case of both negligent supervision and training and her

21

claim of intentional infliction of emotional distress."[21]  (Doc. #34 at 42).  Because Plaintiff did not respond to Defendant's motion for summary judgment on her negligent supervision, hiring, retention, and training claim, she has abandoned it.  Accordingly, Defendant's motion is due to be granted with respect to that claim.

But even if she had not abandoned this claim, Plaintiff would not be entitled to proceed to a jury on it.  As Defendant correctly argues, its actions were not negligent with respect to Plaintiff's retaliation claims because Plaintiff failed to put Defendant on notice of the alleged wrongdoing.  Under Alabama law, "an essential element of negligent supervision is the employer's notice of the employee's improper conduct."  *Alfa Life Ins. Corp. v. Hughes*, 861 So.2d 1088 (Ala. 2003) (*citing Lane v. Central Bank of Alabama, N.A.*, 425 So.2d 1098 (Ala. 1983)); *see also Ledbetter v. United American Ins. Co.*, 624 So.2d 1371, 1373 (Ala. 1993) ("[P]laintiffs, to avoid a summary judgment on their negligent supervision claim against an employer for harm done to them by its former employee, 'must show or demonstrate that [the employer] had notice or knowledge (actual or presumed) of [the employee]'s alleged incompetency for [the employer] to be held responsible; demonstrating liability on [the employer]'s part requires affirmative proof that [the employee]'s alleged incompetence was actually known to [the employer] or was discoverable by [the employer] if it had exercised care and proper diligence.'" (*citing Perkins v. Dean*, 570 So.2d 1217, 1219-20 (Ala. 1990))).  There is no evidence that Plaintiff attempted to put Morrison on notice, or that Morrison should have known of Mr. Carmichael or any other supervisor's alleged retaliatory conduct.  For this reason, Plaintiff's negligent supervision claim is due to be dismissed.

---

[21] All of the "above supporting case law" relates to Plaintiff's intentional infliction of emotional distress claims.  None of the cases involves a claim for negligent supervision and training. There is no argument of any kind in Plaintiff's brief relating to her negligent supervision claims.

### III.    Conclusion

In viewing the evidence in a light most favorable to Plaintiff, the court finds that Defendant's motion for summary judgment is due to be granted in part and denied in part.  There are issues of material fact to be presented to a jury on Plaintiff's claims for retaliation under Title VII and § 1981. With respect to Plaintiff's promotion claims, claims for negligent supervision, hiring, training, and retention, and claims for intentional infliction of emotional distress, there exists no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.

Defendant's motion to quash untimely discovery is due to be denied.  Plaintiff's motion to compel is due to be granted.  Plaintiff's motion to strike declarations of Gina Paige and Rob Cooperman is moot and Defendant's motion to strike portions of Plaintiff's affidavit is due to be granted.  An order consistent with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** this _____17th_____ day of April, 2009.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

23